**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21 Cr. 35 (RC)** |
| **JUSTIN JERSEY,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Justin Jersey to a term of incarceration of 63 months -- the top of the guideline range as contemplated by the plea agreement and calculated by the United States Probation Office – three years of supervised release, $32,165.65 in restitution, and the mandatory $100 special assessment for the count of conviction.

## I.      INTRODUCTION

The defendant, Justin Jersey, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] Although the stipulated Statement of Offense filed in this case reflects a sum of more than $1.4 million dollars for repairs, *see* ECF No. 221 at ¶ 6, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Jersey, carrying a large, gnarled stick, positioned himself at the front of a large mob on the Lower West Terrace ("LWT") of the United States Capitol building.   From this location, he attacked a line of police officers guarding an entrance to the building.   Jersey viciously assaulted one of the officers with his hands, grabbing his face and knocking him to the ground, leaving him vulnerable to attack by other rioters who subsequently dragged the officer out of an archway, down a set of steps, and into a crowd of rioters.   Jersey then obtained a weapon – a police baton – and used it to strike at other officers in the line.   After retreating back into the crowd, Jersey remained in the area and collected the helmet of the officer he had brutally knocked down as a trophy.   The officer sustained serious injuries as a result of the attacks on the LWT, including from Jersey's assault.

The Government recommends that the Court sentence Jersey to 63 months' incarceration for his conviction of violating 18 U.S.C. § 111(a) and (b), a sentence at the top of the advisory Guidelines range of 51 to 63 months, which the Government submits is the correct Guidelines calculation.   Such a sentence reflects the seriousness of Jersey's criminal conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The Government refers the Court to the stipulated Statement of Offense filed in this case, ECF 221, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### *Assaultive Conduct in Tunnel Leading to the Doors of the West Front of the U.S. Capitol Building*

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of

violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.   *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117   Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

Many of the of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").   The entrance usually consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long (the "Tunnel").   That tunnel led to two sets of metal swinging doors inset with glass.   On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the Tunnel is framed by a stone archway (the "Archway") that is a visual focal point at the center of the West Front of the Capitol Building, as circled in red below.



*Exhibit 1*[2]

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 PM, the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles, and other items.   Officers created a line in the doorway to block the rioters and

---

[2] Exhibit 1 is taken from "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

physically engaged them with batons and OC spray.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for more than two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers, engaging them in intense hand-to-hand combat.   Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 p.m.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

### B.      Justin Jersey's Role in the January 6, 2021 Attack on the Capitol

During a particularly volatile period on the LWT, Justin Jersey sprang out of the crowd of rioters and charged at the line of police officers protecting the entrance to the Tunnel.   His actions sparked a brutal 90-second group assault on multiple officers, as a result of which two officers were dragged into the armed, angry mob of rioters, one of whom sustained serious injuries.   Proud of his violent conduct, Jersey took souvenirs home with him: two MPD helmets and an MPD badge.   Jersey's criminal actions are documented in social media posts, footage from body-worn cameras ("BWC") worn by MPD officers, and open-source video and photographs.

### *Jersey's Plans to Travel to Washington, D.C.*

On January 5, 2021, Jersey and a friend made plans to travel, along with Jersey's girlfriend, to Washington, D.C. from Michigan.   One of the motivations for the trip was to document the "Stop the Steal" rally.   However, Jersey exchanged Facebook messages that indicated that he anticipated that violence would occur on January 6, 2021.   For example, the defendant exchanged

the following Facebook messages on January 5, 2021:

**Author** Justin Jersey (Facebook: 100040308376925)
   **Sent** 2021-01-05 23:44:11 UTC
   **Body** I'm going to dc

**Author** ▮▮▮▮▮▮▮▮ Facebook: 100028109524660)
   **Sent** 2021-01-05 23:56:47 UTC
   **Body** When?

**Author** ▮▮▮▮▮▮▮▮ Facebook: 100028109524660)
   **Sent** 2021-01-05 23:57:23 UTC
   **Body** Come get me I wanna go

**Author** Justin Jersey (Facebook: 100040308376925)
   **Sent** 2021-01-06 00:12:39 UTC
   **Body** Leaving in about an hr

**Author** Justin Jersey (Facebook: 100040308376925)
   **Sent** 2021-01-06 00:16:02 UTC
   **Body** Fly down and you can ride back with us

**Author** ▮▮▮▮▮▮▮▮ Facebook: 100028109524660)
   **Sent** 2021-01-06 00:20:54 UTC
   **Body** I can't fly down over there lol

**Author** Justin Jersey (Facebook: 100040308376925)
   **Sent** 2021-01-06 00:22:36 UTC
   **Body** We r driving down my buddy Trevor messaged me wanting to to go
           get some good pictures of the inauguration and any protesting or
           what not

**Author** ▮▮▮▮▮▮▮▮ (Facebook: 100028109524660)
   **Sent** 2021-01-06 01:46:53 UTC
   **Body** Ok stay safe and take a small concealed club

**Author** ▮▮▮▮▮▮▮▮ (Facebook: 100028109524660)
   **Sent** 2021-01-06 01:46:59 UTC
   **Body** Love you

**Author** Justin Jersey (Facebook: 100040308376925)
   **Sent** 2021-01-06 01:57:48 UTC
   **Body** Yeah I'll have something w me

*Exhibit 2*

| | | |
|---|---|---|
| **Sent** | 2021-01-06 00:52:54 UTC | |
| **Body** | I'm going to dc | |

| | | |
|---|---|---|
| **Author** | Justin Jersey (Facebook: 100040308376925) | |
| **Sent** | 2021-01-06 00:53:09 UTC | |
| **Body** | https://m.youtube.com/watch?v=s5ScxwgOxAg&feature=share | |
| **Share** | **Date Created** | 2021-01-06 00:53:09 UTC |
| | **Summary** | Tuesday, January 5, 2021: Join the RSBN crew for live coverage a rally by President Trump's supporters at Freedom Plaza ahead of Wednesday big protest organ... |
| | **Title** | □□ LIVE: STOP THE STEAL Coalition Pre-Rally at Freedom Plaza Ahead of Tomorrow's Big Events in DC |
| | **Url** | https://www.youtube.com/watch?v=s5ScxwgOxAg |

| | | |
|---|---|---|
| **Author** | Justin Jersey (Facebook: 100040308376925) | |
| **Sent** | 2021-01-06 00:53:50 UTC | |
| **Body** | If anything were to happen tell my daughter I love her | |

*Exhibit 3*

After they arrived in Washington, D.C., Jersey and his girlfriend walked, with others, along the National Mall, then to the West Plaza of the U.S. Capitol building – the site of numerous clashes between rioters and law enforcement.   They eventually made their way to the Lower West Terrace.

### *Jersey's Assaults of Officer A.W. and Other MPD Officers*

By 4:27 p.m., police officers had been defending the Tunnel for nearly two hours, advancing and retreating as rioters fought their way into the Tunnel.   In the minutes immediately prior, officers had been attempting to expel rioters from the Tunnel and the Archway.   The crowd of rioters was crushed against the line of police officers protecting the Archway; many rioters tumbled out of the Tunnel and several were trampled by the mob.   Justin Jersey stood in the crowd, facing the officers, holding a large, gnarled stick.   *See* Exhibit 4[3] at 16:26:43-16:26:58. He moved towards the Archway, through the sea of rioters, wielding the stick above his head as if prepared to attack:

---

[3] Exhibit 4 is footage from Officer A.W.'s BWC from approximately 4:26:41 p.m. to 4:28:44 p.m.



*Exhibit 4A*

Jersey then stepped back into the crowd, removed his backpack, likely for greater mobility, and reapproached the line of officers in the Archway, maneuvering around other rioters, holding the stick with both hands.   Before he reached the line of officers, however, Jersey was approached by an individual wearing a cowboy hat, who told Jersey to "knock their masks off." Jersey handed the stick to that individual, and, at approximately 4:27 p.m., charged at the line of officers.   *See* Exhibit 4 at 16:26:54-16:27:09.

Officer A.W. was positioned at the front of the Archway.   Jersey grabbed Officer A.W.'s baton with one hand and reached towards Officer A.W.'s face with his other hand.   Jersey and Officer A.W. grappled over the baton for several seconds.



*Exhibit 5[4]*



*Exhibit 4B*

---

[4] Exhibit 5 is a still image from the BWC of another MPD Officer in the Archway, Officer L.M.



*Exhibit 4C*

Jersey did not succeed in taking Officer A.W.'s baton, but knocked Officer A.W. to the ground.

Seconds after his assault of Officer A.W., Jersey grabbed another baton[5] and used it to strike at other police officers in the Archway.   *See* Exhibit 4 at 16:27:20-16:27:25; Exhibit 6[6] at 16:27:21-25.

---

[5] Officer A.W. was still holding his own baton as Jersey swung at the other officers.   *See* Exhibit 4D (Officer A.W.'s hand circled in green).   It is unclear from whom Jersey obtained the baton that he used to strike at the officers.

[6] Exhibit 6 is footage from the BWC of another MPD officer in the Archway, Officer D.P., from approximately 4:27:08 p.m. to 4:28:08 p.m.



*Exhibit 6A[7]*



*Exhibit 4D*

---

[7] Jersey is circled in red.  Co-defendants Whitton and Sabol are circled in orange and blue, respectively.

After these assaultive actions, Jersey fell backwards into the crowd, then stood up and walked down a set of steps that led to the Archway.  *See* Exhibit 6 at 16:27:26-16:27:32; Exhibit 7[8] at 00:50-00:59.

Jersey's charge at Officer A.W. was one act that precipitated the (re-)eruption of violence on the LWT.   At that point, rioters had just been pushed out of the Tunnel by police officers; many were still facing away from the Archway and the officers.   *See* Exhibit 4 at 16:26:41-16:27:05; Exhibit 7 at 00:00-00:35.   Video captured by an individual on the LWT demonstrates that, as Jersey grabbed Officer A.W. from the north side of the Archway, his co-defendant, Jack Wade Whitton, began striking at officers from the south side of the Archway with a crutch:



*Exhibit 7A (Exhibit 7 at 00:32)*

---

[8] Exhibit 7 is a portion of video footage captured by an individual located on the south side of the LWT.



*Exhibit 7A (zoomed)*[9]

With the commencement of these two assaults, all hell broke loose.   Other rioters surged towards

the Archway, throwing objects at the officers and striking at them with makeshift weapons such

as a hockey stick, a pieces of wood, a flagpole, and a law enforcement riot shield.   *See* Exhibit 7

at 00:30-00:50.

As Jersey was swinging the baton at the officers in the Archway, Officer A.W. was lying

supine on the ground.   While Officer A.W. was on the ground, his helmet was knocked off,

another rioter -- co-defendant Sabol -- stole his baton, and he was further assaulted by other

members of the mob, including Jersey's co-defendants: Whitton leapt over a fence, kicked at

---

[9] Jersey is circled in red; Whitton is circled in orange.

Officer A.W., struck another officer -- Officer B.M. -- with a crutch, and – with assistance from co-defendants Sabol and Barnhart -- dragged Officer B.M. headfirst over Officer A.W., down a set of steps and into the crowd of rioters.   There, rioters struck Officer B.M. with objects, including co-defendant Peter Stager, who beat Officer B.M. with a flagpole and co-defendant Mason Courson, who struck Officer B.M. with a baton.   Co-defendant Ronald Colton McAbee then grabbed at Officer A.W.'s torso, while co-defendant Clayton Ray Mullins grabbed Officer A.W.'s leg and the two engaged in a tug-o-war with officers who were trying to pull Officer A.W. back into the Archway.   Eventually, McAbee pulled Officer A.W. out of the Archway and the two slid down a set of stairs and into the crowd together, with McAbee on top of Officer A.W. and pinning Officer A.W. down.   As he was dragged into the mob, Officer A.W. was kicked, struck with poles, and stomped on by several individuals. Additionally, Officer A.W. recalled being maced once his gas mask was ripped off.   When a third officer, Officer C.M., stepped out of the Archway in an attempt to come to the aid of Officers A.W. and B.M., he was assaulted by McAbee, then by co-defendant Lopatic.   *See generally* Exhibits 4, 6, 7.

As his co-defendants and other rioters were hitting, beating, and striking Officers A.W., B.M., and C.M., Jersey was positioned farther down the set of steps leading to the Archway. While the other assaults were occurring, Jersey bent over and picked up Officer A.W.'s helmet,[10] which had fallen down the steps, and put it on his own head, as depicted below:

---

[10] Officer A.W.'s badge number is visible on the front of the helmet in Exhibit 8.



*Exhibit 8*



*Exhibit 7A (Exhibit 7 at 01:09)*

Although Officer A.W.'s helmet fell off of Jersey's head several seconds later, Jersey left

Washington, D.C. with that helmet, another MPD officer's helmet, and an MPD officer's badge.

He displayed one of those helmets behind the bar in his home, as depicted below:



*Exhibit 9*



*Exhibit 10*

FBI agents also recovered an MPD badge from a box in Jersey's residence and Officer A.W.'s helmet from an associate of Jersey's who said that Jersey had given it to her.

### *Officer A.W.'s Injuries*

With the assistance of another individual, who prevented other rioters from further assaulting Officer A.W. after he was dragged into the mob, Officer A.W. was able to make his way back to the Archway area.   Once he was back in the Tunnel, another officer realized that Officer A.W. was bleeding from his head.   *See* Exhibit 11[11]; Exhibit 12.[12]   Officer A.W. was subsequently escorted to the east side of the Capitol building before being taken to the hospital. At the hospital, Officer A.W. was treated for a laceration on his head which required two staples to close.   He also sustained bruising on multiple areas of his body, including contusions on his elbow.   Due to his injuries, Officer A.W. was off duty until May 2021.   At that time, he returned to limited duty, but did not return to full duty until approximately July 2021.

### III.    THE CHARGES AND PLEA AGREEMENT

On November 17, 2021, a federal grand jury returned a superseding indictment charging Justin Jersey with seven counts, including, violations of 18 U.S.C. § 111(a)(1) and (b) and § 2 (Assaulting, Resisting, or Impeding Certain Officers or Employees and Inflicting Bodily Injury or Using a Deadly or Dangerous Weapon, and Aiding and Abetting) (Counts Nine and Thirteen), 18 U.S.C. § 231(a)(3) (Obstruction of Law Enforcement During Civil Disorder) (Count Fourteen), 18 U.S.C. §§ 1752(a)(1), (2), (4) and (b)(1)(A) (Knowingly Entering or Remaining in any Restricted Building or Grounds with a Deadly or Dangerous Weapon, Disorderly and Disruptive Conduct in

---

[11] Exhibit 11 is footage from Officer A.W.'s BWC from approximately 4:29:20 p.m. to 4:30:48 p.m.

[12] Exhibit 12 is footage from the BWC of another MPD officer who was in the Tunnel from approximately 4:29:21 p.m. to 4:30:26 p.m.

any Restricted Building or Grounds with a Deadly or Dangerous Weapon, and Engaging in Physical Violence in any Restricted Building or Grounds with a Deadly or Dangerous Weapon) (Counts Eighteen, Nineteen, and Twenty) and 40 U.S.C. § 5104(e)(2)(F) (Violent Entry and Disorderly Conduct on Capitol Grounds) (Count Twenty Four).   On, September 7, 2022, Justin Jersey was convicted of Count Nine, Assaulting, Resisting, or Impeding Certain Officers or Employees, Inflicting Physical Injury, in violation of 18 U.S.C. § 111(a)(1) and (b), based on a guilty plea entered pursuant to a plea agreement (the "Plea Agreement," ECF No. 220).

## IV.     STATUTORY PENALTIES

Jersey now faces sentencing on one count Assaulting, Resisting, or Impeding Certain Officers, Inflicting Bodily Injury, in violation of 18 U.S.C. § 111(a)(1) and (b).   As noted in the Plea Agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000 or twice the gross pecuniary gain or loss of the offense, and a mandatory special assessment of $100.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   The Sentencing Guidelines calculation set forth in the PSR is the same as the calculation to which the parties stipulated in the plea agreement.   According to the PSR and the parties, Jersey's adjusted offense level under the Sentencing Guidelines as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[13] | Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(3)(B) | Serious Bodily Injury | **+5** |

---

[13] § 2A2.2 applies here because Jersey's conduct involved aggravated assault.   *See* U.S.S.G. § 2A2.4(c)(1).

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(7) | Conviction under 18 U.S.C. § 111(b) | **+2** |
| U.S.S.G. § 3A1.2(a)-(b) | Government Official Victim;<br>Application of Chapter 2, Part A of U.S.S.G. | **+6** |
| | **Adjusted Offense Level:** | **27** |
| U.S.S.G. § 3E1.1(a)-(b) | Acceptance of Responsibility | **-3** |
| | **Total Offense Level:** | **24** |

*See* PSR ¶¶ 54-65; Plea Agreement, Section 4.C.

The U.S. Probation Office calculated Jersey's criminal history as category I, which is not disputed. PSR at ¶¶ 67-68. Accordingly, the U.S. Probation Office calculated Jersey's total adjusted offense level, following a three-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b), as 24, and his corresponding Guidelines imprisonment range as 51-63 months. PSR at ¶ 128.   The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Justin Jersey's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Jersey's assault on Officer A.W. was an instigating spark in the brutal assaults that occurred over the following few minutes on the LWT.   He was one of the first assailants to commence what became a prolonged, multi-assailant attack on law enforcement officers, and which resulted in injury to those officers, including serious injuries.   It

was Jersey who pulled Officer A.W. out of the line of officers in the Archway and who caused him to fall to the ground, leaving Officer A.W. vulnerable to the mob of rioters below and prompting other officers to attempt to come to his aid, thereby exposing themselves to further assault. And Jersey immediately segued from this vicious attack to another assault on law enforcement, this time armed with a baton. Finally, Jersey took home trophies of his criminal conduct that day, proudly displaying an MPD helmet on his wall.

The nature and circumstances of Jersey's offense were of the utmost seriousness, and fully support the government's recommended sentence of 63 months' incarceration.

### B. The History and Characteristics of the Defendant

Although the defendant has only one criminal conviction and one additional arrest, both demonstrate a troubling relationship with weapons and a tendency to resort to violent confrontation. Indeed, the defendant's conviction arose out of a domestic dispute where he was reported to possess weapons and where the defendant escalated his initial encounter with law enforcement, prompting one officer to attempt to taser him. Later, after he was apprehended the defendant indicated that he wished the officers had shot him. PSR ¶ 67. Approximately one month prior to this incident, the defendant was arrested for (although not ultimately charged with) possessing a firearm whose serial number had been altered, when a rifle with a filed-off serial number was recovered from the street following a dispute between the defendant and the mother of one of his children. PSR ¶¶ 70, 80. This history also weighs in favor of a lengthy term of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Although he ostensibly traveled to Washington, D.C. to document the "Stop the

Steal" rally, when he witnessed violent confrontation of law enforcement by rioters, Jersey did not leave the Capitol grounds, nor did he passively document the events.   Rather, he looked for an opportunity to attack and assaulted multiple officers, causing at least one of them significant injury, and prompting others to do so as well.   And he took trophies of his violence, displaying an MPD helmet on his wall, giving Officer A.W.'s helmet to an associate, and keeping an MPD badge in his home.   This was the epitome of disrespect for the law.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[14] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration.

First, while not necessarily premeditated, Jersey's actions on January 6, 2021 were deliberate and dangerous.   *See* Sections II(B) and IV(A) *supra*.   Second, as noted above, Jersey's arrest and conviction history is illustrative of a troubled man who is quick to resort to violence. *See* Section VI(B) *supra*.   Third, the fact that Jersey took trophies of January 6, which he displayed and gifted to others, demonstrates a pride in his conduct and a lack of remorse.

---

[14] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v.*

*Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[15]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

---

[15] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide useful comparisons to the relevant sentencing considerations in this case.

*United States v. Webster*, 21-cr-208 (APM).   Webster, a former United States Marine and retired New York City Police Department officer, brought a bulletproof vest, a firearm, and food provisions with him to Washington, D.C. on January 5, 2021.   On January 6, 2021, he wore he bulletproof vest and carried a metal flagpole to the Capitol grounds.   On the West Plaza, he elbowed his way through the crowd until he got to the front of the mob and began yelling at an officer stationed behind a metal barricade.   When the officer tried to swat Webster's hand away, Webster continued to yell, then pushed against the barricade, prompting the officer to shove him back.   Webster than brought the flagpole down repeatedly on the barricade in front of the officer, causing it to break, then charged the officer, tackled him to the ground, and attempted to rip off his gas mask.   Webster subsequently went to the LWT, where he witnessed the assault on another police officer, Officer M.F..   At trial, Webster was convicted of six counts: violations of 18 U.S.C. §§ 111(a) and (b), 231(a)(3), 1752(a)(1) and (b)(1)(A), 1752(a)(2) and (b)(1)(A), 1754(a)(4) and (b)(1)(A) and 40 U.S.C. § 5104(e)(2)(G).   In that case, the Court determined that the defendant's total offense level was 37 and criminal history category was I, resulting in a Guidelines range of 210 to 240 months' imprisonment.[16]   The Government recommended a sentence of 210 months'

---

[16] Webster's range of 210-262 months was capped by the 20-year statutory maximum sentence

imprisonment.   The Court imposed a 120-month sentence.

To be sure, Webster's conduct is distinguishable from Jersey's in several respects.   For one, Jersey did not arm himself, don protective gear, or bring other supplies with him to the Capitol on January 6, 2021.[17]   Jersey also accepted responsibility for his conduct by pleading guilty prior to trial, while Webster's offense level was significantly increased by his lack of acceptance of responsibility and obstruction of justice, evidenced by, among other things, his testimony at trial and his attempt to delete evidence from his phone.[18]   However, Jersey's and Webster's assaultive conduct bears similarities to each other:   Amid particular volatility and tension, each worked his way to the front of the mob of rioters in order to confront police officers.   Each singled out a particular officer to attack, knocking him to the ground.   Each inflicted injuries on his victim, although the injuries suffered by Officer A.W. were more severe than those suffered by the officer whom Webster assaulted.

*United States v. Palmer*, 21-cr-328 (TSC).   On the LWT, Palmer threw a wood plank at officers, then deployed the contents of a fire extinguisher directly into the Tunnel and threw the empty extinguisher at the officers.   For the next several minutes, Palmer continued to push and throw objects at the officers in the Tunnel.   Later, on the Upper West Plaza, Palmer approached a line of officers, yelling, and threw a pole at them.   Palmer pled guilty to one count: a violation of

---

for a violation of 18 U.S.C. § 111(a) and (b).

[17] Although Jersey told a Facebook contact that he would "have something" with him, the Government does not have evidence of Jersey deploying a weapon that he brought with him to the Capitol.

[18] Had Webster not received an enhancement for obstruction of justice and had he received credit for acceptance of responsibility, his offense level would have been 32, resulting in a Guidelines range of 121-151 months.   Had Webster also not received enhancements for using body armor in connection with a crime of violence (U.S.S.G. § 3B1.5(2)(B)) and restraint of victim (U.S.S.G. § 3A1.3), his offense level would have been 26, resulting in a Guidelines range of 63-78 months.

18 U.S.C. § 111(a)(1) and (b).   In that case, the Court determined that the defendant's total offense level was 26 and criminal history category was I, resulting in a Guidelines range of 63-78 months imprisonment.[19]   The Government recommended a sentence of 63 months' imprisonment.   The Court imposed a 63-month sentence.

While Palmer's assaultive conduct was spread over both a longer time frame and a larger area, Jersey's assaults were more acute and resulted in significant injuries to Officer A.W.

*United States v. Head and Young*, 21-cr-21 (ABJ).   Head and Young both participated in an assault of another MPD officer in the Tunnel and on the LWT at 3:18 p.m., approximately an hour prior to Jersey's assault of Officer A.W.   Young entered the Tunnel at approximately 2:43 p.m., just after rioters first attempted to breach at that point, and participated in rioters' efforts to force their way into the Tunnel.   Young provided another rioter with a taser and showed that rioter how to use it.   He also directed a strobe light at the police line, threw an audio speaker towards officers (striking another rioter), and jabbed a long stick towards the police line.   Head entered the Tunnel slightly later, at approximately 3:07 p.m., after pushing his way through the crowd on the LWT to get to the Archway.   Head put on a gas mask that a fellow rioter handed him and fought to get to the front of the mob, until he was directly up against the police line, where he pushed a riot shield into the line for several minutes.   At approximately 3:18 p.m., Head grabbed MPD Officer M.F. around the neck and pulled the officer off of the police line, into the crowd of rioters in the Tunnel and on the LWT, yelling "Hey!   I got one!"   There, Officer M.F. was assaulted by multiple individuals, including a rioter who tased the back of his neck and Young,

---

[19]  Palmer did not receive a three-level reduction pursuant to U.S.S.G. §3E1.1 because of his post-plea conduct.   Had he received that reduction, Palmer's guideline range would have been 46-57 months' imprisonment.

who restrained Officer M.F. by the wrist.   Young them moved towards another officer who has been pulled into the crowd, USCP Officer M.M., and assaulted him, grabbing at his helmet and body, pushing him, and hitting him, while Head continued to try to assault Officer M.F.   Young and Head each pled guilty to one count: a violation of 18 U.S.C. § 111(a)(1).

The Court determined that Young's total offense level was 24[20] and criminal history category was IV, resulting in a Guidelines range of 77-96 months' imprisonment.   The Government recommended a sentence of 86 months' imprisonment.   The Court imposed a 86-month sentence on Young.   The Court determined that Head's total offense level was 24 and criminal history category was VI, resulting in a Guidelines range of 96 months' imprisonment.[21] The Court imposed a 90-month sentence on Head.

Head and Young's assault of Officer M.F. bears an eerie similarity to the assaults of Officers A.W. and B.M. on the LWT approximately an hour later.[22]   Each involves officers who were singled-out and pulled off of the police line, separating them from their fellow officers and leaving them vulnerable to an angry, assaultive mob.   Like Head, Jersey actively sought to be at the front of the crowd, up against the police line, and therefore ignited the ensuing group assault. And, although Officer M.F.'s injuries are of a different nature than Officer A.W.'s, both are serious, requiring hospitalization and significant recovery time.

---

[20] Both Young and Head received an additional two points due to their restraint of Officer M.F. pursuant to U.S.S.G. § 3A1.3.   However, because each was convicted of a violation of 18 U.S.C. § 111(a), they did not receive a two-point enhancement pursuant to U.S.S.G. § 2A1.1(b)(7).

[21] Head's range of 100-125 months was capped by the 8-year statutory maximum sentence for a violation of 18 U.S.C. § 111(a).

[22] Indeed, both Head and Young's offense level – 24 – is the same as Jersey's; only their more significant criminal histories result in higher Guidelines ranges.

## VII.    RESTITUTION

The Court should order Jersey to pay a total of $32,165.65 in restitution: $2,000 to the Architect of the Capitol and $30,165.65 to the Metropolitan Police Department, which covered the costs of Officer A.W.'s medical treatment and time off work due to his injuries.

### A.  The Court Should Order the Defendant to Pay Restitution to the Architect of the Capitol.

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.  The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Jersey must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Jersey played in the riot on January 6.[23] Plea Agreement at 8. As the Plea Agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55"[24] in damages, a figure based on loss estimates supplied by the Architect of the

---

[23] The government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[24] As noted above, the Government's current estimate of the damages caused by the riot on January 6 is more than $2.8 million.

Capitol in mid-May 2021.   *Id.*   This restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 153.

**B. The Court Must Order the Defendant to Pay Restitution to the Metropolitan Police Department.**

In addition, the parties agreed that, under 18 U.S.C. §§ 3663(b)(2) and 3663A(b)(2), Jersey must also pay restitution to "all victims who suffered bodily injury as a result of [his] conduct," including Officer A.W.   Plea Agreement at 8.   As reflected in Exhibit 13, the MPD incurred a total of $30,165.65 on Officer A.W.'s behalf that is attributable to the offense of conviction; the Court must therefore order that the defendant pay restitution in this amount.[25]   *See* 18 U.S.C. § 3664(j)(i) ("If a victim has received compensation from insurance or any other source with respect to a loss, the court *shall* order that restitution be paid to the person who provided or is obligated to provide the compensation,") (emphasis added).

---

[25] A violation of 18 U.S.C. § 111(b) is a crime of violence under the Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A),   *See* 18 U.S.C. § 3663A(c)(1)(A)(i) (requiring mandatory restitution for "a crime of violence, as defined in [18 U.S.C.] section 16"). That means that restitution for that offense is mandatory. 18 U.S.C. § 3663A(a)(1).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of a term of incarceration of 63 months, three years of supervised release, $32,165.65 in restitution, and the mandatory $100 special assessment for the count of conviction

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:  *Colleen D. Kukowski*

Colleen D. Kukowksi
Assistant United States Attorney

Benet J. Kearney
Assistant United States Attorney

Matthew Moeder
Assistant United States Attorney

601 D Street, N.W.
Washington, D.C. 20530
Colleen.Kukowski@usdoj.gov / (202) 252 2646
Benet.Kearney@usdoj.gov / (212) 637 2260
Matthew. Moeder@usdoj.gov / (816) 426-4103