**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

United States of America,          ) Criminal Action
                                   ) No. 1:21-cr-00035-RC-9
              Plaintiff,           )
                                   ) **Sentencing**
vs.                                )
                                   )
Justin Jersey,                     ) Washington, D.C.
                                   ) **February 10, 2023**
              Defendant.           ) Time:  2:00 p.m.
_____

**Transcript of Sentencing**
**Held Before**
**The Honorable Rudolph Contreras**
**United States District Judge**


A P P E A R A N C E S

For the Government:      **Benet Kearney**
                         UNITED STATES ATTORNEY'S OFFICE
                         One Saint Andrew's Plaza
                         New York, New York 10007

                         **Colleen D. Kukowski**
                         UNITED STATES ATTORNEY'S OFFICE
                         FOR THE DISTRICT OF COLUMBIA
                         601 D Street, Northwest
                         Washington, D.C. 20579

For the Defendant:       **Alfred Guillaume, III**
                         LAW OFFICES OF ALFRED GUILLAUME, III, LLC
                         1350 Connecticut Avenue, Northwest
                         Washington, D.C. 20036

Also Present:            Crystal Lustig, Probation Officer
_____

Stenographic Official Court Reporter:
                         Nancy J. Meyer
                         Registered Diplomate Reporter
                         Certified Realtime Reporter
                         333 Constitution Avenue, Northwest
                         Washington, D.C. 20001
                         202-354-3118

<u>P R O C E E D I N G S</u>

1
2   THE COURTROOM DEPUTY:  This is Criminal Action 21-35,
3 United States v. Justin Jersey.
4   Counsel, please approach the podium and state your
5 appearances for the record.
6   MS. KEARNEY:  Good afternoon, Your Honor.  Benet
7 Kearney and Colleen Kukowski for the United States.
8   THE COURT:  Good afternoon.
9   MR. GUILLAUME:  Good afternoon.  For the record,
10 Alfred Guillaume for Justin Jersey, who is seated at the table
11 to my right.
12   THE COURT:  Good afternoon, Mr. Jersey.  Good
13 afternoon.
14   All right.  So, Mr. Jersey and defense counsel, have you
15 reviewed the presentence report as revised following the
16 defense and the government exhibits?
17   MR. GUILLAUME:  Yes, Your Honor.
18   THE COURT:  Any additional objections?
19   MR. GUILLAUME:  No, Your Honor.
20   THE COURT:  Any from the government?
21   MS. KEARNEY:  No, Your Honor.
22   THE COURT:  Okay.  So under Federal Rule of
23 Criminal Procedure 32(i)(3)(A), the Court will accept the
24 presentence report as its findings of fact on issues not in
25 dispute.

1          This case falls within the Sentencing Reform Act of 1984

2     under which Congress created the United States Sentencing

3     Commission which has issued detailed guidelines for judges such

4     as myself to consider in determining the sentence in a criminal

5     case like this.  The commission has set sentencing ranges for

6     specific offenses, and those ranges are contained in the

7     *Guidelines Manual*.

8          However, in light of the Supreme Court's decision in

9     *Booker*, the guidelines are not mandatory.  They are advisory,

10    but they must be consulted by the Court in determining the

11    appropriate sentencing in a case.  Therefore, I will assess

12    and determine the proper sentence in this case by reference

13    to and in consideration of the guidelines in the first

14    instance, but the guidelines will be treated as advisory, not

15    mandatory, and there's no presumption that the guideline

16    sentence is the correct sentence.  The guidelines will be

17    considered along with all the other relevant factors pursuant

18    to 18 U.S.C. 3553(a).

19         Defendant has pleaded guilty to Count 9 of the third

20    superseding indictment, inflicting bodily injury on certain

21    officers and aiding and abetting in violation of 18 U.S.C. §§

22    111(a)(1) and (b), 2.

23         As reflected in the presentence report, using the

24    2021 *Guidelines Manual*, the base offense level is 14.  There's

25    a 5-point enhancement for a special offense characteristic

1   because the victim sustained serious bodily injury.  There's an

2   additional 2-point enhancement under the special offense

3   characteristic because the conviction is under 111(b), and

4   there's a 6-point victim-related adjustment because the victim

5   is a government officer and the offense was motivated by such

6   status.  That results in an adjusted offense level of 27.

7        There's a 3-point reduction for acceptance of

8   responsibility, 2-level decrease for clear demonstration of

9   acceptance of responsibility; and an additional 1 level for

10  assistance in investigation by timely provision of information

11  concerning involvement and by timely notification of intent to

12  enter a guilty plea.  That results in a total offense level of

13  24.

14       With respect to criminal history, there's no prior

15  convictions that -- that earn points, which results in a

16  criminal history level of I.

17       The guidelines range for imprisonment based on a total

18  offense level of 24 and a criminal history category of I is

19  51 to 63 months.

20       Defense counsel, any objection to those calculations?

21            MR. GUILLAUME:  No objection, Your Honor.

22            THE COURT:  All right.  Government?

23            MS. KEARNEY:  No objection.

24            THE COURT:  Okay.  So as I've said, under the law,

25  following *Booker*, the guidelines are advisory in this case but

 1    will be considered fully by the Court in determining the proper

 2    sentence, along with all the other relevant factors under

 3    3553(a).

 4         Would the government like to address the Court regarding

 5    sentencing?

 6              MS. KEARNEY:  Yes, Your Honor.

 7              THE COURT:  All right.  Go ahead.

 8              MS. KEARNEY:  Before I speak, Your Honor, I just

 9    wanted to alert the Court, MPD Officer Andrew Wayte is here

10    today.  And after I finish, he'd like to address the Court, if

11    possible.

12              THE COURT:  That was my first question for you.

13              MS. KEARNEY:  I assume the Court is familiar with the

14    exhibits that we've submitted.

15              THE COURT:  I am.

16              MS. KEARNEY:  I saw that your clerk downloaded them.

17              THE COURT:  Yeah.

18              MS. KEARNEY:  So as Your Honor is aware, the

19    government is recommending a sentence at the top of the

20    guidelines range.  In this case, that's 63 months.

21         And that's appropriate for several reasons, Your Honor.

22    First, the defendant, Mr. Jersey, was an instigator of a brutal

23    multi-assailant multi-victim assault.  He left his primary

24    victim, Officer Wayte, in a perilous situation and a situation

25    that caused additional officers to render themselves vulnerable

1    to an angry assaultive mob.  The injuries he inflicted on

2    Officer Wayte were quite severe, and then he subsequently,

3    following that assault, turned his attention to other officers

4    and assaulted them.

5         But let me take a step back and set the scene for

6    Your Honor because I know this case was recently transferred,

7    and so you are not as familiar with the specific exhibits in

8    this case as in perhaps other January 6th cases.

9         So on January 6th at approximately 4:27 p.m., over the

10   course of 90 seconds to 2 minutes, a group of rioters on the

11   lower west terrace of the U.S. Capitol Building brutally and

12   viciously attacked a line of police officers who were defending

13   the building.  By the time that violence subsided, two officers

14   had been dragged out into the crowd.  One was still stranded

15   out there, and at least one had sustained serious injuries to

16   his head.  Multiple others had been further assaulted.  They

17   had been punched, kicked, and struck with various weapons, both

18   intrinsic and makeshift.

19        And this defendant, Mr. Jersey, is charged along with

20   eight other men for their roles in that gang assault.  And I

21   use that word purposefully, Your Honor, because it's truly what

22   it was.  This was a perhaps spontaneous gang, but this was

23   truly a group action, and the danger level and the risk

24   presented to these officers was exponentially heightened by the

25   fact that there were multiple assailants in a mob that were

1   attacking them.

2            THE COURT:  Let me ask you a quick question there

3   because I didn't see it addressed anywhere in the papers.

4        Now, the defendant said that he just caught a ride with

5   his buddies from Michigan.  Are the people he rode with any of

6   the co-defendants?

7            MS. KEARNEY:  No, Your Honor.  There was no

8   allegation this was a planned conspiracy or that any of the

9   co-defendants knew each other before these events.

10           THE COURT:  Okay.  And do you know if any of the

11  other buddies that rode with him from Michigan ended up being

12  charged?

13           MS. KEARNEY:  Yes.  One individual, Trevor Brown, was

14  charged but in a completely separate case.

15           THE COURT:  Okay.  He wasn't at the tunnel?

16           MS. KEARNEY:  He was in the area, Your Honor, but as

17  far as I know, he did not participate in this particular

18  assault.

19           THE COURT:  Okay.

20           MS. KEARNEY:  But Mr. Jersey is charged along with

21  eight other men in this assault.  And, by coincidence,

22  Your Honor, he is the first to be sentenced, but that timing is

23  fitting because he's also the first to attack.  And along with

24  the co-defendant Mr. Whitton, it was he who opened the

25  floodgates to this round of violence.  It was -- it was his

1    attack that set off the mob for this particular round.

2          And so, first, I want to play, first,

3    Government Exhibit 7, which is about 2 minutes long, and it

4    captures, really, almost the entirety of the assault.  This is

5    taken from the vantage point of an individual in the crowd on

6    the lower west terrace.

7          THE COURT:  Okay.  Hold on.  Let me turn my monitor

8    back on because it was --

9          MS. KEARNEY:  I'm going to play the first few seconds

10   to orient the Court.

11          (An audio-visual recording was played.)

12          MS. KEARNEY:  All right.  I've paused it at about

13   11 seconds.

14          Mr. Jersey is wearing the red backpack and wielding a

15   long stick in, basically, the center of the frame.

16   Officer Wayte is in the center of the arch wearing one of the

17   neon MPD jackets.

18          (An audio-visual recording was played.)

19          MS. KEARNEY:  There are several things that I want to

20   point out to the Court in this video.  First, as it begins,

21   things are volatile on the lower west terrace.  They are

22   chaotic, but there is actually a momentary lull in the

23   violence.

24          As I'll explain to the Court in the next exhibit, at

25   this point officers had been expelling rioters from what we

1    call the tunnel.  That is that area beneath the archway, and

2    rioters are being pushed out.  You can see in the first

3    10 seconds, they're descending the steps.  They are walking

4    away from the police line.  Some are tumbling, but they're

5    moving away.

6              (An audio-visual recording was played.)

7              MS. KEARNEY:  And, in contrast, Mr. Jersey is moving

8    towards the officer.  He is wielding a large stick above his

9    head, and he's looking for an opening here to attack.  He's

10   being strategic.  He takes off that red backpack for greater

11   mobility.

12             So, first, I'd like to play about the next 25 seconds

13   of Exhibit 7.  And I'm going to switch to Government Exhibit 4,

14   which is the perspective from Officer Wayte's body-worn

15   camera.

16             (An audio-visual recording was played.)

17             MS. KEARNEY:  And this is Government Exhibit 4.

18             (An audio-visual recording was played.)

19             MS. KEARNEY:  So I'm going to pause there at about

20   8 seconds in, Your Honor, just to highlight what I explained

21   before.

22             Things are tense.  They are volatile, but the rioters

23   are on their way out of the tunnel at this point.

24             (An audio-visual recording was played.)

25             MS. KEARNEY:  I'm pausing at 10 seconds, Your Honor.

 1          Mr. Jersey is here on the right-hand side of the screen

 2    with the -- holding the stick above his head.

 3               THE COURT:  This is still the gnarled stick; right?

 4               MS. KEARNEY:  Yes.

 5               (An audio-visual recording was played.)

 6               MS. KEARNEY:  I'm pausing at 19 seconds, Your Honor.

 7          He backs into the crowd and takes off his backpack,

 8    and you'll see him as he reapproaches the line, he maneuvers

 9    around other rioters looking for an opening to attack the

10    police line.

11               (An audio-visual recording was played.)

12               THE COURT:  Now, the guy with the cowboy hat, is he

13    one of the co-defendants?

14               MS. KEARNEY:  He's not.  He's separately charged,

15    Your Honor.

16               THE COURT:  What is his name, do you know?

17               MS. KEARNEY:  I believe his last name is Nellis,

18    N-e-l-l-i-s.  I'm not 100 percent sure.

19               THE COURT:  Okay.  That's fine.

20               MS. KEARNEY:  What I think is clear from those

21    30 seconds, Your Honor, is that this is not someone who

22    reflectively reacted to being pushed by an officer.  This is

23    not someone who tripped over something and took an officer

24    down with him.  This is someone who, during an incredibly

25    tense moment, planned an attack, and that attack incited the

1    mob as a whole.  It sparked this group assault.  And you'll see

2    that, Your Honor, in Government Exhibit 7, which I'll switch

3    back to.

4            THE COURT:  And beyond seeing it, you can hear it

5    because the volume of the crowd erupts at that point in time

6    and it's --

7            MS. KEARNEY:  You beat me to my point, Your Honor,

8    which is you can hear the mob turn on as Mr. Jersey approaches.

9            This is starting at approximately 30 seconds in.  And

10   as Your Honor noted, the volume suddenly increases

11   exponentially.  There's -- there is an eruption of sound.

12           (An audio-visual recording was played.)

13           MS. KEARNEY:  I'm pausing there at about 45 seconds,

14   Your Honor.

15       I think -- you know, we wrote this in our memo, and I

16   think it is not an exaggeration to say all hell broke loose at

17   this point.

18           THE COURT:  The guy with the hockey stick, is he one

19   of the co-defendants?

20           MS. KEARNEY:  No.  The man with the crutch,

21   Your Honor, in the green jacket is a co-defendant.

22       And so as Mr. Jersey and, to some extent, Mr. Whitten

23   open the floodgates, the mob descends upon this group of

24   officers who are in the archway.

25       And the nature of the assault itself -- of -- of just

1    Mr. Jersey's assault is brutal.  He grabbed the officer's face,

2    knocks him to the ground, and knocks off his helmet.

3         I'm going to play Government Exhibit 4, which is

4    Officer Wayte's body camera, and I'm actually going to slow it

5    down, Your Honor, because this occurs over the course of a few

6    seconds, and it's difficult to fully see.

7         THE COURT:  No, I encourage you to do that.  It makes

8    it easier to take it in.

9         MS. KEARNEY:  So this will be at approximately

10   25 seconds.  Again, this is where Mr. Jersey hands off the

11   stick to the man in the cowboy hat.

12         (An audio-visual recording was played.)

13         MS. KEARNEY:  And I'm pausing there, Your Honor.

14         At this point the officer is literally lying on his back

15   in the archway.  His camera is pointing at the arch above.

16   He's got no helmet.  In about 3 seconds, another rioter is

17   going to steal his baton, and his feet are at the mob.  He is

18   in, perhaps, the most vulnerable position he could be in.

19         And he suffered significant injury.  We've -- we've

20   detailed a bit of that in our submission, and some of that is

21   in the two videos we submitted under seal, Exhibits 11 and 12,

22   where you can really see the injury.

23         THE COURT:  Sure.  Just for the record, the video in

24   which they pour water over his head makes it clear how much

25   blood came out of that wound.

1      MS. KEARNEY:  Exactly, Your Honor.  And, you know,

2  the treatment required -- that is, staples to close the

3  wound -- and the significant recovery time, I think, really

4  underscore the severity of those injuries.

5      But, as I mentioned, the officer has no helmet, no

6  weapon, and on his back at the mercy of the crowd.  And from

7  that position, he's subjected to violence by other rioters.

8  And Mr. Jersey turns his attention to other officers, and I'll

9  come back to that in a minute.

10      But from this position, the officer is kicked.  He's

11  dragged by his legs into the mob, and he is pinned under a

12  rioter for more than 25 seconds.  And the reason he is in this

13  position, Your Honor, is because of Mr. Jersey's assault.  It

14  is Mr. Jersey who knocks him to the ground causing him to lose

15  his helmet, rendering him vulnerable to that rioter who takes

16  the officer's means of defense.

17      And the other thing that this assault causes is for

18  other officers to place themselves at risk in attempts to aid

19  Officer Wayte.  So other officers come off the line to try and

20  bring him back, rendering themselves vulnerable to that mob.

21  Notably, another officer, Officer B.M., is himself dragged into

22  the crowd.  And you can see him be pulled over Officer Wayte as

23  he attempts to come to his aid.

24      I'm just going to play starting at 40 seconds, Your

25  Honor, and I'll play it just a little bit faster.

1          (An audio-visual recording was played.)

2          MS. KEARNEY:  And so that officer has now become the

3     victim of the mob.

4          A third officer steps off the line to help both officers

5     who have been dragged out into the crowd, and then himself is

6     punched and otherwise assaulted by the rioters.

7          I'll play a few more seconds.

8          (An audio-visual recording was played.)

9          MS. KEARNEY:  I'll pause there at 1 minute and

10    12 seconds.

11         And so as I referenced before, Your Honor, although

12    Mr. Jersey has only pled guilty and being sentenced for the

13    assault of Officer Wayte, that is not the only assault he

14    committed that day.  Once Officer Wayte is on the ground, once

15    he's failed to take his baton from Officer Wayte, he turns his

16    attention to the officers to his left, the officer's right, and

17    he obtained a baton -- to be clear, we don't know from whom --

18    and rains down blows on them, Your Honor.  I think it's

19    particularly chilling to watch.

20         I'm going to play it from two different angles.  The

21    first is from the perspective of outside of the arch.  And so

22    that's Exhibit 7 starting at about 45 seconds.

23         (An audio-visual recording was played.)

24         MS. KEARNEY:  I'll stop at 57 seconds.

25         And now I'm going to play Exhibit 6, which is the

1    body-worn-camera footage of an officer standing to

2    Officer Wayte's right.  I'm going to play about the first

3    30 seconds.

4              (An audio-visual recording was played.)

5              MS. KEARNEY:  I'm sorry.  This is still in slow

6    motion.  Let me play it normally.

7              (An audio-visual recording was played.)

8              MS. KEARNEY:  I mentioned before, Your Honor, that I

9    think one of the things that the early portions of the videos

10   show is that Mr. Jersey's attack was not impulsive, and it's

11   borne out by his conduct following January 6th as well.

12        He left the Capitol Grounds that day with souvenirs of

13   his conduct:  Officer Wayte's helmet, which had fallen off the

14   officer's head and which Mr. Jersey retrieved at the bottom of

15   the steps.  There's video of that in Government Exhibit 7;

16   another MPD officer's helmet; and -- and an MPD badge.  And he

17   kept one helmet and that badge in his own home, displaying the

18   helmet on the wall behind his bar.  And he gifted

19   Officer Wayte's helmet to a friend.

20        Those actions are not the actions of someone who feels

21   great remorse or shame for their conduct.  Mr. Jersey took

22   souvenirs because he was proud of what he had done.

23        In addition, Mr. Jersey's criminal history -- while, you

24   know, Your Honor notes that they're not -- the convictions

25   don't generate any history points, they do indicate that

1    violence he engaged in on January 6th was not an aberration.

2    He has a history of violent confrontation, including inviting

3    confrontation with law enforcement, and including confrontation

4    involving weapons.  And that's particularly concerning to the

5    government here because it demonstrates that this conduct on

6    January 6th is perhaps illustrative and a culmination of a

7    troubled relationship with violence and with weapons.

8            I'd like to give the Court a chance to ask any

9    additional questions that it has.

10            THE COURT:  Sure.  I mean, I've watched it all.  The

11    papers are very clear.

12            The one more technical question I have for you is

13    with respect to the restitution involving Officer Wayte;

14    if that would be joint and several with any of the

15    co-defendants?

16            MS. KEARNEY:  Yes.  And I think in theory it would

17    be, Your Honor.  Mr. Jersey is the first to be sentenced, and

18    so at this point there would be no one to -- to specify in an

19    order, but I think if subsequent defendants are convicted and

20    sentenced, it would be appropriate for that to be joint and

21    several.

22            THE COURT:  Okay.

23            MS. KEARNEY:  But before I conclude, Your Honor,

24    Officer Wayte is going to address the Court, and I think that

25    he will offer a perspective that I can't give and I think will

1    be very useful to the Court.

2         But before he does so, I want to leave the Court with

3    the closest thing to his perspective on that day, which is the

4    2 minutes of his body-worn camera, which is, I think, the

5    closest we can have to the experience.

6         THE COURT:  Okay.  So before you do that, let me ask

7    you this question:  Now, I had asked you to provide the most

8    recent chart, and I had done this -- there's really one other

9    111 case that I sentenced.  And I had done this exercise back

10   last summer.  And I noticed back then that all the sentences,

11   regardless of what the government asked for, kind of clustered

12   around the low end of the guidelines.

13        So I brought that analysis up to date, and I -- and

14   I manipulated the numbers three or four different ways.

15   You know, I looked at -- there's about 30 of them now.  I

16   looked at all 30 of them.  They cluster -- about 27 percent

17   of them are the exact low end of the guidelines, and the

18   others, if you averaged them, end up at the low end of the

19   guidelines.

20        I took out all but the ones that involved 111(a) and

21   (b).  Same -- same thing.  They all cluster around the low end

22   of the guidelines.  I looked at ones that just had guidelines

23   ranges, more or less.  There's -- none of them have identical

24   guidelines ranges to this defendant, but ones that were close.

25   Same thing; the average is almost exactly a hundred percent of

1     the low end of the guidelines.

2           So I need you to explain to me, despite all these other

3     defendants -- some of them who have done very similar things --

4     all getting, more or less, the low end of the guidelines.  What

5     makes this defendant not different than the public at large but

6     different than the other 111(a) and (b) defendants?

7           MS. KEARNEY:  I think for the reasons I cited at the

8     beginning, Your Honor, is that I think many -- and I don't

9     have a comprehensive list of 111(b) defendants, but many

10    of those defendants, I think, are likely 111(b)s because

11    they used weapons, not because of the extent of the injuries

12    suffered.  And those are aggravating in different ways; right?

13          The use of a weapon is inherently dangerous and,

14    therefore, warrants a higher sentence.  And, look, Mr. Jersey

15    did use a weapon, just not in the offense of conviction.  And

16    so that's an aggravating factor for the Court to consider as

17    well.  But here, you know, the severity of the injuries

18    suffered, I think, is quite indicative of the ferocity of the

19    attack.  It's determined, it's motivated, and it's vicious, I

20    think is the appropriate term for it.

21          Another factor is that there are two assaults here.  You

22    know, one -- one resulting in serious injury; one with a

23    weapon.  And the very nature of the assault as a group attack,

24    which, I think, is inherently more harmful, you know.  Nine

25    people can do a lot more harm than one or two.  And that's

1   borne out by the way this attack proceeded; right?

2       Mr. Jersey knocked Officer Wayte to the ground,

3   assaulted him, I would -- you know, caused significant injury

4   and left him to the mercy of these other rioters who further

5   assaulted him.  And so the -- the gang nature of this,

6   Your Honor, is inherently egregious and warrants a significant

7   sentence.

8       I would also posit, Your Honor, I think many of the

9   guidelines ranges are slightly different, simply because of

10  details about -- about the assault.  And appropriately so.  So,

11  for example, we cited *Head* and *Young* in our sentencing

12  submission.  And those were defendants convicted of

13  111(a) charges, but they also received an enhancement for

14  restraint of victim because of the way they -- they handled

15  their victim.

16      The injuries that that victim suffered, different in

17  nature than Officer Wayte's, but significant, just as severe.

18  And those defendants were sentenced, you know, with- -- within

19  their guidelines.  And I'll note that one of the guidelines

20  was, in fact, capped by the statutory maximum.  And so I think

21  Mr. Jersey's assault is quite analogous to those two assaults

22  in the positioning and targeting of the officer, in the

23  determined nature of the defendant to get to that officer.  You

24  know, Mr. Head worked his way to the front of the line,

25  selected his victim, and pulled him off the line, much in the

 1    same way that Mr. Jersey did.

 2              THE COURT:  So this was Head and Young?

 3              MS. KEARNEY:  Yes.

 4              THE COURT:  And they were co-defendants?

 5              MS. KEARNEY:  They were.  And they were involved in

 6    an assault about an hour earlier, also in the tunnel.

 7         The other case we cited --

 8              THE COURT:  Hold on.  Let me see if I can quickly

 9    bring those up.

10              MS. KEARNEY:  So Mr. Head's calculated guidelines

11    range was 100 to 125 months, but the statutory maximum is -- is

12    8 years.  And so his range was -- was capped.

13              THE COURT:  I can't put --

14              MS. KEARNEY:  It was Judge Berman Jackson, if that

15    helps you find it.

16              THE COURT:  Well, the -- in chronological order, do

17    you remember when that one was?

18              MS. KEARNEY:  Within the past month or so, I think.

19              THE COURT:  Oh.

20              MS. KEARNEY:  Maybe two months.

21              THE COURT:  Okay.  That's helpful.  Okay.  I -- so

22    was Young, Philip Young?

23              MS. KEARNEY:  Kyle --

24              THE COURT:  Kyle Young?

25              MS. KEARNEY:  Kyle Young.

```
 1              THE COURT:  Okay.  I think that one -- Kyle Young
 2    goes further back than that.  Kyle Young.  And co-defendant
 3    was --
 4              MS. KEARNEY:  Albuquerque Head.
 5              THE COURT:  So they were sentenced at different
 6    times?
 7              MS. KEARNEY:  Yes.  It's page 36, Your Honor.
 8              THE COURT:  Page 36 of the chart.  Okay.  There it
 9    is.  So Head got the low guidelines?
10              MS. KEARNEY:  Yes.
11              THE COURT:  And Young got above -- so on average,
12    they almost got exactly the low end of the guidelines?
13              MS. KEARNEY:  Yes.  But their -- their cumulative
14    sentence for an assault that is quite similar.
15              THE COURT:  Sure.  No, I understand.
16              MS. KEARNEY:  Peculiarly similar.
17              THE COURT:  But they exemplify -- what I'm saying
18    is that they all cluster around the low end of the guidelines.
19    Young got, I think, 112 percent of the guidelines and Head
20    got, like, 90 percent of the -- low end of the guidelines.  So.
21              MS. KEARNEY:  Yes.  And I think Head's guidelines
22    were driven, in large part, by his criminal history.  And so,
23    you know, we're approaching this with the guidelines as a
24    starting point, Your Honor, but I think the nature of the
25    assaults is quite similar.
```

1          Mr. Jersey's criminal history, I think, doesn't quite

2     capture -- his score doesn't quite capture the actual history.

3     And so the top of the guidelines is a much more comparable and

4     appropriate number here.

5          I do also want to talk a little bit about *Palmer*, which

6     the government also cited, which is also, to prove Your Honor's

7     point, the bottom of the guidelines.  But that was driven by a

8     guilty plea with no acceptance points.  So that guidelines

9     range is -- is inflated over what it would have been had he

10    not -- had he fully accepted his responsibility.  And I believe

11    his range would have been the same as Mr. Jersey's.

12         And then, finally --

13              THE COURT:  If he got -- had gotten an acceptance?

14              MS. KEARNEY:  Had he -- had he been given credit for

15    acceptance.

16              THE COURT:  Okay.

17              MS. KEARNEY:  And Mr. Guillaume also cited

18    Lucas Denney as a comparator in his submission, who received a

19    below-guideline sentence.  And, obviously, I handled that case,

20    and so I respectfully disagree with that sentence, but that

21    conduct is really not an apt comparator.  You know,

22    Mr. Denney's conduct is very serious in that he engaged in

23    significant preplanning.  You know, he brought supplies.  He

24    recruited people to come with him, and he engaged in numerous

25    assaultive incidents that day.

1          But the severity of those incidents was not what

2    happened in Mr. Jersey's case.  There were no injuries.  He

3    was deploying things like pepper spray from a distance, which,

4    while serious, is of a different caliber than a face-to-face

5    physical confrontation that results in an officer being

6    grounded.  And so, you know, they're -- they're charged

7    with the same thing, but the descriptors are very, very

8    different.

9          THE COURT:  Uh-huh.  Okay.

10         MS. KEARNEY:  I'd like to play the full exhibit now.

11         THE COURT:  Please.

12         (An audio-visual recording was played.)

13         MS. KEARNEY:  That clip is 2 minutes and 3 seconds

14   long, Your Honor.  And I think it captures just how long

15   2 minutes is from the perspective of an officer who is

16   completely at the mercy of a violent mob.  I'm sure they were

17   the most excruciating 2 minutes of Officer Wayte's life, and

18   he's in that position because of Mr. Jersey.

19         Thank you.

20         THE COURT:  Thank you.

21         OFFICER WAYTE:  Good afternoon, Your Honor.

22         THE COURT:  Good afternoon.

23         OFFICER WAYTE:  How are you doing?

24         I'm Officer Wayte; Officer Andrew Wayte.  I work for the

25   Metropolitan Police Department here in D.C.  I'm a patrol

1   officer and assigned to the Sixth District.  It's on the east

2   side of the river, you know.  So I'm usually on the southeast

3   side; been doing that close to five years now.

4        Violence isn't something that's new to me in my role

5   there.  You know, I'll come across a lot of different things:

6   domestic violence, murders, heinous activity.

7        Please -- please forgive me.  This isn't my typical role

8   here, but I'm doing my best.

9             THE COURT:  Of course.  Take your time.

10            OFFICER WAYTE:  Thank you, sir.

11        Anyways, like I'm trying to say, I'm -- I'm accustomed

12   to a certain degree of violence and -- and -- I don't know.

13   Harsh realities of that; correct?  But, you know, I'm still

14   employed here.  I still go back to work after January 6th,

15   after the injuries that I endured.

16        Every single day, you know, when I go to work, I come

17   across the Woodrow Wilson Bridge, look over to my left.  I can

18   see the Capitol Building over there, you know, in the distance,

19   and so there's always that reminder.  You know, I'm always here

20   in the city.  I can always see the site, one of the most

21   important parts of my life, an important part of a lot of

22   people's lives.  So I have that constant reminder and the

23   memory.

24        I know it's been described, the injuries that I was

25   subjected to, and like the video shows, a certain amount of --

1   of my experience, even watching it back, it's -- I don't feel

2   it's effective necessarily in communicating the totality of how

3   it felt in that situation.  You know, you can see people

4   striking me.  You can see me falling.  You can see all those

5   different things.  I mean, it doesn't really capture the

6   essence of the fear, of the uncertainty of what I thought was

7   going to happen next.

8        It was -- it was just anarchy.  It was chaos.  It's not

9   something that I'd encountered even before in my experience.  I

10  mean, like I said, I've seen the -- the essence of -- of fatal

11  violent encounters.  And this experience, you know, I was

12  certain it was going to be me this time.  You know, I -- I knew

13  I was going to die.  That's how my mindset was at that point,

14  you know, when I got dragged into the crowd afterwards.  I

15  just -- I could feel it, you know.

16       At that point, my mask had been stripped off.  My helmet

17  had been taken away.  You know, I'm just getting pummeled.

18  Sticks, boots.  Everyone's getting their licks in; right?  And

19  I didn't know the severity of my injuries at that point in

20  time.  I didn't know I was bleeding yet, but, you know, you

21  just feel all that coming in.

22       And I remember thinking to myself, you know, when I'm

23  just stranded out there, like, this is -- this is probably

24  going to be it, you know.  I don't know if it's going to be

25  this exact moment.  But I just remember thinking to myself, you

1    know, I'm either going to -- I'm either going to die fast or

2    I'm going to die slow here, so pick your -- pick your route.

3    Slow is probably better.  I may get a chance to get out of

4    this, and -- you know, so I had to -- I had to deal with that

5    and the consequences of that.

6         Eventually, I did make my way back out of that crowd.

7    No one pulled me out.  No one -- no one saved me; right?

8    You know, I had to get up.  And that's what I did, and I got

9    out, but --

10        THE COURT:  Did you think about drawing your service

11   weapon?

12        OFFICER WAYTE:  That was all I could think about.

13   All I wanted was to use that to defend myself, but I -- I

14   vividly remember in those moments that -- you know, I can take

15   this out -- right? -- maybe defend myself for a few seconds

16   against maybe one or two attackers; right?  But, I mean, I

17   got 14, 15, a thousand people, you know, surrounding me.

18   There's no way I can effectively defend myself and do it in a

19   way where I'm not only protecting myself but people who aren't

20   even assaulting me.

21        If I pull out my service weapon, I start brazenly

22   shooting at people on top of me, bullets travel.  It's going

23   to hit other people behind them.  And I knew -- I knew if I did

24   do that that there was other guns in that crowd.  It's not

25   just me there.  This is America.  I know what we have around,

1    and even if that's not the case, they're going to take mine

2    from me, and that's going to be the last thing I see.  It's

3    going to be my own barrel and lights out.  And that's why I

4    refrained.

5         Like I said, I was taking the slow route, you know, get

6    beaten, apparently, for a while.  But I couldn't breathe, you

7    know.  I'm just -- there's so many bodies pressing on you.

8    Even before I got out of the tunnel, I couldn't stand up

9    straight.  There's so many people.  If you took a step, you're

10   stepping on people.  And there were just like a rioting mass

11   underneath you.  It's impossible to be planted.

12        But, you know, so I'm out in that mob.  And, yeah, I

13   knew it was going to be the slow route.  That's how I had to do

14   things in order to possibly survive, but it didn't seem likely.

15   Like I said, I felt like I was suffocating.  My mask had been

16   taken off.  There had been some sort of chemical deployed on

17   me.  I don't know if it was OC spray or bear spray or -- I'm

18   effectively blind at that point.  And just getting hit from

19   every which way.

20        But, like I said, I did eventually get myself out of

21   there.  I did make my way back.  And, you know, it doesn't just

22   stop there.  You know, it's -- there's consequences of my

23   injuries going forward.  You know, I -- I couldn't do my job

24   for a little while.  Months.  I was injured in January.  I

25   don't think I made it back to, like, full-duty status until

1    maybe August or something like that, that year.  It was a long

2    time.  A large part of it I wasn't even on limited capacity.

3    They just, you know, completely sidelined me and -- so like I

4    said, there's repercussions of that.  I mean, the injuries

5    themselves, they heal, naturally.  But --

6              THE COURT:  So they were -- the nature of your

7    injuries were primarily physical.  Did you suffer any, like,

8    brain fog or anything like that from your head injuries?

9              OFFICER WAYTE:  From what I've discussed with doctors

10   since then, they believed I had a traumatic brain injury.  You

11   know, I had a -- my scalp split open, and I was struck

12   repeatedly.  There wasn't just that one injury, but there was a

13   lot of head trauma.

14             THE COURT:  Sure.

15             OFFICER WAYTE:  And so -- you know, I mean, I lost a

16   lot of the will to even want to do the job at that point, a lot

17   of the desire to even get up out of bed, you know.  I was

18   just -- physically it took a while to recover just to get, you

19   know, strong enough to really walk around and --

20              I remember the next day I had to go to the doctor.

21   And, you know, I'm trying to be macho, trying to be the big

22   guy.  I'm like, you know, I'll just drive over to the doctor.

23   No big deal, whatever.  And, you know, I go outside, and I

24   can't even -- the sunlight was debilitating.  I couldn't do

25   anything.  I had to call a buddy of mine's wife because he's

1   at work.  I had to call her to drive me to the doctor because

2   I just couldn't do it.  And it took time in order to actually

3   get back to a point where I felt whole.  And it took a lot of

4   time.

5        You know, obviously, I got a personal stake in this.

6   But, you know, I -- I've got faith in our institutions.  I

7   always -- you know, January 5th, January 6th now, I mean,

8   that's -- that's where my trust lies.  All I wanted to

9   communicate to you was the process for me and some of the

10  recovery aspect of it.  I have faith in your abilities and your

11  direction, and I appreciate the opportunity to speak here

12  today, Your Honor.

13        THE COURT:  All right.  Well, thank you for your

14  testimony.  And thank you for your restraint.

15        You know, I'm sure it must be irritating for you to hear

16  folks focus on Ashli Babbitt or whatever.  And if it not for

17  the restraint of you and other officers, which I've heard

18  nearly identical testimony about the restraint of not drawing

19  their service weapons.  If not for the almost superhuman

20  restraint that you and others exhibited, there would have been

21  a lot more casualties on that day.  So thank you for that.

22        OFFICER WAYTE:  Thank you.

23        THE COURT:  Thank you.

24        All right.  Mr. Guillaume.

25        MR. GUILLAUME:  Yes, Your Honor.

1           THE COURT:  Did I pronounce that correctly?

2           MR. GUILLAUME:  Yes, you did.  Thank you.

3           THE COURT:  Okay.

4           MR. GUILLAUME:  Your Honor, before I get started, I

5     just want to recognize the testimony of Officer Wayte and his

6     heroic actions that day on behalf of myself and my client.  My

7     client offers no excuse for his behavior.  He's embarrassed by

8     his behavior.  He's ashamed of his behavior.  For what it's

9     worth, I think you're a hero.

10          And my job is to advocate for my client, and I'm going

11    to do that, but just know that your testimony was not in vain

12    in spite of what happens today.  He, as well as I, appreciate

13    the actions that you took that day to protect this country and

14    the -- the politicians that were in the building and just our

15    democracy in general that it was a function of.

16          Sorry for what happened to you, Officer Wayte, and I

17    thank you for your testimony.  So please don't take anything

18    that I say with respect to my client as a personal affront to

19    you, because it is not.

20          Your Honor, this is clearly one of the darkest days in

21    American history.  My client played a part in that.  He knows

22    that he bears responsibility for his actions, but I'm asking

23    you to look at him -- and I know you will -- as an individual

24    with specific circumstances and not as a person who was

25    portrayed on this video because even he will tell you that

1    that's not who he is.  That's not who he was before.  It's not

2    who he is now.  And, unfortunately, as Madam Prosecutor stated,

3    the 2 minutes is an eternity when you're dealing with something

4    like that.  And I don't disagree.

5         But Mr. Jersey is a person who -- although he caused

6    hurt to another who has a family, he has a family himself who

7    care about him, who love him, and who will be there to support

8    him when he is released from prison.

9         He will be released from prison one day.  And when he's

10   released, he would go to an environment that will not have him

11   in the same predicament that it's gotten him in today, he was

12   in the environment before.  As Your Honor is aware from my

13   submission, Mr. Jersey has had a number of personal struggles,

14   which I will kind of talk about towards -- towards the end of

15   my presentation here, that I think are relevant to any sentence

16   that the Court gives.

17        I do want to say also, of course, that he accepts full

18   responsibility.  So I don't want you to think that by me

19   offering mitigating arguments I'm trying to excuse his

20   responsibility.  Please don't do that, Your Honor.  I don't

21   think you will, but I just want to say that some of the

22   actions that he took that day, while they were not rational

23   in any sense of the imagination, they offer some sort of

24   an explanation as to what was going through his mind.

25        I think it's relevant to start off and say that

1    Mr. Jersey, as you can see, sitting here today, he's not a big

2    man at all; as a matter of fact, a very small man.  Not to say

3    small people can't do any damage, because, clearly, he did.

4    But he's 5 feet and weighs less than 150 pounds.  By contrast,

5    I'm over 6 feet and weigh 250 pounds.  I'm twice as big as he

6    is.

7         And he didn't come to Washington that day to -- looking

8    for any trouble.  He didn't come to pick a fight.  He would be

9    kind of silly if -- someone that size looking to pick a fight,

10   because he would, more than likely, lose.  However, he did get

11   caught up in a horrendous incident, and he fell victim to a mob

12   mentality.

13        For what it's worth -- and, again, I don't want the

14   Court to misinterpret what I'm saying as an excuse.  Mr. Jersey

15   had heard there was someone who was injured in the crowd -- and

16   it's not his responsibility to tend to that person, by -- by

17   any means -- but that kind of -- injured by the police or -- or

18   by law enforcement.  He didn't know the details.  There's a lot

19   of talking that's going on out there that day.  A lot of

20   misinformation.

21        Although I will say there was someone that's on the

22   video that's in distress, a civilian.  I don't know what that

23   person did to cause that situation.  But I -- what I did

24   confirm with the government some time ago, when I first got

25   this case, that there was someone who passed away -- correct me

1    if I'm wrong -- that was right there.  And I don't know what

2    time frame that occurs and the assault, but Mr. -- there were

3    people talking about people being injured, people being hurt.

4    And that explains some of his actions.  Again, not an excuse.

5    He had no business being in that position.

6         He came to -- to D.C. -- D.C. with a friend.  The

7    friend -- I'm hearing now for the first time -- was charged

8    separately, but he was actually looking for that friend at the

9    time when all this goes -- goes on, and here he comes across

10   this tunnel that is -- becomes quite notorious in the -- for

11   those of us that are dealing with these January 6th cases.  And

12   you can see the horror and the terror and the absolute chaos

13   that -- that's there.

14        But Mr. Jersey pays for his sins -- even though he

15   causes great damage -- pretty quickly because, again, he's not

16   a big person.  He didn't have any protective gear.  He didn't

17   come with any sort of intent to fight.  So as the video shows,

18   he's hit -- and not saying he shouldn't be -- right back.  So

19   he gets it as good as he gives it.  He actually walks away

20   and walks down the steps, but at that point I know that it's --

21   all hell's broken loose.  And he starts something that you

22   can't put the genie back in the bottle at that point.  So the

23   officers are left to fend for themselves, and he actually

24   leaves.

25        And I do -- we do recognize his role in beginning --

1    starting the confrontation, but he -- he doesn't stay for a

2    very long period of time.  And I know -- I don't want you to

3    think that I'm minimizing his -- his importance of his role.  I

4    just think it is a relevant factor to consider.  There's some

5    people in the video who are inviting the fight, who want the

6    fight, who are continuing to fight, and those are some of the

7    people that are charged in this case.  And he's not one of

8    those -- one of those folks.

9         So as far as in the universe of the defendants charged

10    here, Mr. Jersey exits more quickly than some of the other

11    folks.  And I think that is relevant in that he, I think,

12    realized as soon as this was going on, like what am I doing.

13    I'm not physically able to fight these people, even with a

14    bunch of people at my back, and he just gets out of it.  Like,

15    you can tell he's walking away.  He kind of staggers down the

16    steps.  He wasn't under the influence of any drugs or anything

17    at the time, but it's just --

18         I can't explain a mob mentality.  I've never been part

19    of one.  But just looking at all this footage that I've seen in

20    this case and others, apparently it's -- it is a real thing.

21    And for whatever reason, people fall victim to it.

22         Your Honor, as far as the Court's need to -- kind of

23    going through some of the factors here the Court has to

24    consider -- protect the public, I would hope as an American

25    citizen, and as I think most people in this room or in

1    this country would hope, some of this would never happen again

2    ever.

3         And Mr. Jersey is one of those people.  He hopes that

4    he -- he deeply regrets his involvement, and he hopes that --

5    he wishes he could take back what happened.  He knows he can't.

6    He knows he's going to spend time in jail.  He's already spent

7    time in jail.  He will continue to spend time in jail.  But he

8    doesn't want this to happen and doesn't ever want it to happen

9    again.  So it's safe to say --

10        THE COURT:  Let me ask you this question.  I mean,

11   everybody that appears before me is remorseful after they get

12   caught.

13        MR. GUILLAUME:  Of course.

14        THE COURT:  What should I make of the fact that he

15   took the trophies?

16        MR. GUILLAUME:  I'm going to get to that.  I

17   appreciate you bringing that up.

18        THE COURT:  Okay.

19        MR. GUILLAUME:  He's -- I'll just go ahead and

20   address it now.  I mean, it's inexcusable.  There's no -- he

21   can't really offer any logical reason other than it was a

22   stupid thing to do and he kept it.

23        I will say that he did not post anything on social media

24   like some -- like a lot of other people did, either before or

25   after, which shows kind of his state of mind.  But he did pick

1    up a necessary tool that -- beyond necessary -- all for the

2    protection of the law enforcement that was there, and he -- he

3    took it.  There's no other way around it.  He wishes -- he

4    wishes he didn't take it.  It led to his arrest, quite

5    frankly.  It lead -- it helped lead -- when he's arrested,

6    rather, it shows that, you know, he was -- there was no

7    mistake.  The video is, obviously, clear in the case of that

8    as well.

9         But kind of going back to the need to protect the

10   public, Your Honor, this is one -- I don't know the future, but

11   I would hope it would never, ever happen again.  Mr. Jersey

12   would never be a participant in it.  He doesn't live in D.C.

13   He's from Michigan, born and raised.  He's -- I don't think

14   he's going to come back here at any time soon because this is

15   the place where he's committed this crime.  And the citizens of

16   this -- of the District and of the United States don't have to

17   worry about Mr. Jersey anymore.

18        He's not a person -- I want to push back a little bit on

19   the government's assertion that he's -- this was something that

20   has been bubbling over for some time and was going to happen

21   eventually.  I don't -- I don't think that.  From the sense

22   that I get from having known him, the time that I've known him,

23   is that he's had a troubled life in some respects.  He

24   struggled mightily with substance abuse at times.  But he is,

25   by all accounts, from doing our mitigation work, from having

1    spoken with certain individuals of his family -- comes from

2    good stock, polite people, good people, Midwest people that are

3    not -- hardworking.

4         In other words, I don't want to sound cliché when I say

5    this but are just -- just want to do their jobs and love their

6    families, like most of us do -- right? -- and -- and be left

7    alone and don't have any -- he's not an ideologue is what, I

8    guess, I'm trying to say.

9         But he participated in something that was absolutely

10   wrong, and he regrets that.

11        THE COURT:  Let me ask you this question from a

12   danger to the community perspective.  I mean, I'm kind of, I

13   think, old-fashioned in the sense that I'm of the view that

14   if you stand in front of a law enforcement officer and

15   physically attack them, there would be no hesitation to attack

16   any other member of the community if you are angered.  Because

17   if there's any reason to have hesitation, it's when you're

18   confronting a law enforcement officer.  And if you don't

19   have that hesitation, what makes the rest of the community

20   safe?

21        MR. GUILLAUME:  Well, I think that speaks to the mob

22   mentality, Your Honor.  That's the only way I can answer that

23   question.

24        Because Lord knows I would never approach a law

25   enforcement officer or anybody, because I'm not looking for any

1   fights -- especially somebody that I know has a gun, and try to

2   pick a fight with them because nine times out of ten that

3   officer is going to shoot you.  And that didn't happen here,

4   thankfully.  And having Officer Wayte put in the context of why

5   shows -- is -- is a good thing.

6        But I think Mr. Jersey just got caught up -- and it

7   sounds so silly when you think about it now.  He just got

8   caught up in the moment.  You say how can someone get caught up

9   in the moment.  Such -- such a crazy -- why not just walk away,

10   like a lot of people do?  I don't know the answer to that

11   question, Your Honor.  All I know is that it happened and

12   it's --

13        Looking at his character and who he's been these many

14   years of his life, he's had troubles.  He's had struggles,

15   maybe more than most.  He's had a lot of health issues.  He's a

16   small person.  People may look to fight him because they want

17   to bully him, even as an adult.  I don't know.

18        But the fact of the matter is, is that he's not a

19   violent person inherently.  He's a father.  He's -- loves his

20   children.  He's -- has a fiancée who he plans to marry when

21   he's released.  She has children.  And one of the things that I

22   discovered from reading some of the letters sent by family and

23   just talking to him is that there is no separation in -- in --

24   I think his parents may not be together, but step -- there's no

25   such thing as stepbrother, stepsister.

1        One of the things that struck me from reading this --

2    because I know in a lot of families there is a distinct line --

3    and it seems like he has a very loving family and he's part of

4    the reason why.  He took in his wife's -- or his fiancée's

5    children and accepted them and vice versa.  And that just

6    shows -- it's one part of him that shows the type of person

7    that he is.  He's a family man in -- in his core.

8        THE COURT:  I mean, you can't take that too far,

9    because, I mean, his first son he lost custody over to a

10   third party; both he and his then-partner lost custody.  He

11   never has even met the second child.  So I don't think you can

12   paint him that much as a family man.

13       MR. GUILLAUME:  Well, in the sense that he -- he -- I

14   don't want to say he has -- he's struggled and so that we're

15   going to ask the Court for assistance with -- with whatever

16   term of incarceration you impose, that he be given drug

17   treatment; that he be given mental health counseling as a part

18   of the sentence because he needs it.

19       From the day I met him, he's always talked about his

20   children.  I have many cases with many clients, different

21   backgrounds than Mr. Jersey, with family issues.  And I've

22   never -- I know -- I have children myself, and I know that

23   being present is very and extremely important.  And some people

24   might not understand it as much as others.  And I see what

25   Your Honor is saying, but I think he truly wants to be involved

1    in his children's lives and -- and loves them.

2         But the fact is he's had struggles along the way.  No --

3    no doubt about it.  And -- and, again, I keep going back to the

4    substance abuse piece, but I think it's relevant.  I think that

5    is a huge -- a huge piece in his -- not with respect to this

6    case, but just in general.

7         Since we're here, I figure it's a factor, 3553(a), that

8    I can bring up that the Court can consider in fashioning a

9    sentence that would be -- that would help him not to ever --

10   not only do conduct like this, but any kind of conduct because

11   that's a large -- from what I can see from the past conduct,

12   that was a big factor in that -- in the -- in the case that the

13   government was referencing was -- was -- where he was at the

14   time in his life with respect to substance abuse.

15        Your Honor, I don't have much more other than to mention

16   a few things.  My client, since he's been incarcerated during

17   COVID, has been subjected to various lockdowns because of COVID

18   at the facilities he's been at; 23 and 1, not coming out of his

19   cell, not being able to shower.  And I know we're not supposed

20   to -- it's not -- I don't want to say he should be at the

21   Ritz-Carlton either.  But I think it's relevant for someone

22   who's -- in his position who's never spent a substantial amount

23   of time in jail; that the conditions under which he's had to

24   deal with have been very hard.

25        He's dealt with them pretty well.  He's, thankfully, not

1    contracted COVID while he's been incarcerated, but he's still

2    dealt with the aftereffects of it.  Even today, even right now,

3    he's dealing with the restrictions in place.  So I think that

4    is a -- I would hope the Court would consider that in

5    fashioning a sentence.

6               THE COURT:  I will.

7               MR. GUILLAUME:  Also, Your Honor, just to sum up, as

8    I mentioned earlier, he is from Michigan.  Wherever the

9    Court -- I would ask the Court make a recommendation that he be

10   placed in a facility in the Bureau of Prisons in Michigan or

11   close to Michigan so his family can visit.  I was able to

12   identify FCI Milan -- Milan, spelled like the Italian city,

13   M-i-l-a-n -- in -- in Michigan that, potentially, he could be

14   referred to.

15              THE COURT:  And do you also consent to transferring

16   jurisdiction of the supervision in Michigan?

17              MR. GUILLAUME:  Absolutely.  He has no ties here, and

18   I think that would be appropriate.

19              THE COURT:  Does the government have an opposition to

20   that?

21              MS. KEARNEY:  No, Your Honor.

22              THE COURT:  Okay.

23              MR. GUILLAUME:  And, Your Honor, lastly, I would just

24   focus on the thing that you talked -- spoke with the

25   government -- with the government with respect to sentence

1    disparities.  I did reference them -- you read my papers.  I

2    don't want to rehash it here.

3         But there are certain cases we believe that set a

4    precedent for Mr. Jersey receiving a bottom of the guideline

5    sentence.  I did the same analysis as Your Honor did,

6    approximately 30 cases with 111, and I came to the very exact

7    same conclusions with respect to the sentences.  I know that in

8    this case he's the first to be sentenced, but I would just say

9    that there's -- I don't think this case should be an indicator

10   of any potential other sentence because his role was much

11   different than some of the other folks that were there that

12   day.

13        So I -- I think that a sentence -- the bottom of the

14   guidelines is appropriate, sufficient, not greater than

15   necessary to achieve all the goals set forth in -- by

16   Congress in sentencing criminal defendants, Your Honor.

17        I don't have anything further.  Does the Court have any

18   questions for me?

19        THE COURT:  Yeah, I have just a couple technical

20   questions.  One, I didn't see any objection to the -- the MPD

21   calculations of the restitution for the officer.  Do you have

22   any challenge to that?

23        MR. GUILLAUME:  No, Your Honor.  Just if I'm clear,

24   we didn't, but it was -- was it the $2,000?

25        THE COURT:  No.  The $2,000 was to the Architect of

1 the Capitol.

2    MR. GUILLAUME:  Okay.

3    THE COURT:  It was like a 32,000-some -- or 35,000 --

4 I can't remember it right at this moment.  I've got it written

5 down -- that they -- for the lost time and the medical expenses

6 of the officer.

7    MR. GUILLAUME:  It was 32 for the officer, is that --

8 is that the number you just said?

9    THE COURT:  I'll get --

10    MR. GUILLAUME:  I can't remember.  I don't have it in

11 my notes in front of me, so.

12    THE COURT:  I'll give you the exact number.

13 $32,165.65.

14    MS. KEARNEY:  To be clear, that's the total,

15 including the 2,000 for the Architect of the Capitol.

16    MR. GUILLAUME:  Okay.  Thank you.

17    THE COURT:  Oh, so the -- that wasn't clear to me.

18 So the 32,000 includes the 2,000?  Or it's 2,000 to the

19 Architect of the Capitol and 32,165 to MPD?

20    MS. KEARNEY:  30,165 to MPD and 2,000 for the

21 Architect.

22    THE COURT:  Okay.

23    MR. GUILLAUME:  Your Honor, I don't -- I don't have a

24 meaningful objection, but I'll just put this on the record.

25 Like, I was appointed to represent Mr. Jersey.  He's indigent.

1    To the extent that he can pay, he's agreed to pay.  But I don't

2    want his inability to pay to be a barrier in any kind of

3    violation of supervised release or anything like that.

4         He has every intention of making his victim whole again,

5    but just -- I just say that because I've had cases where folks

6    get out, they earnestly try to get work.  They can't, for

7    whatever reason, and depending on whoever the government is --

8    the prosecutor or -- that can become an issue later on down the

9    line.

10        THE COURT:  No, I understand that.  Although I

11   don't have a lot of leeway when it comes to restitution as --

12   in the same way I have for fines.  But the more practical

13   reason I'm asking you is because if you're going to challenge

14   that number, we need to have a separate hearing and present

15   evidence.

16        MR. GUILLAUME:  So we're not challenging the number,

17   Your Honor.  I just wanted to make that clear, as far as that's

18   concerned.

19        THE COURT:  All right.  And then the other question

20   now is because of more recent circuit law on the discretionary

21   standard terms of supervision that probation imposes, we have

22   to get those on the record and we have to get the -- any

23   objections to them, and they were put forward in the

24   presentence report.  I'll tell you what page number they're on.

25   But they're the standard --

```
 1              MR. GUILLAUME:  The standard conditions?

 2              THE COURT:  The standard conditions.  This is

 3    paragraph 146 on page 25 of the presentence report.

 4              MR. GUILLAUME:  Court's indulgence.

 5              THE COURT:  They were the standard conditions we

 6    used to not have to talk about, but now we have to talk about

 7    them.

 8              MR. GUILLAUME:  Right.  I had cases come back because

 9    the judge didn't talk about them.

10         So, Your Honor, no, the standard conditions are -- we

11    have no objection to the standard conditions.

12              THE COURT:  Okay.  Great.  All right.  Are you done

13    with your presentation?

14              MR. GUILLAUME:  I am, Your Honor.

15              THE COURT:  Does Mr. Jersey want to address the

16    Court?

17              MR. GUILLAUME:  May I confer with him?

18              THE COURT:  Of course.

19              (REPORTER'S NOTE:  A sotto voce conference was held

20    between Mr. Guillaume and the defendant.)

21              MR. GUILLAUME:  He'd like to say a few words, not

22    very long.

23              THE COURT:  Okay.

24              THE DEFENDANT:  I'd just like to apologize to the

25    officers involved.  I know they were severely injured, and I
```

1    feel terrible for it.  I'm not a violent person.  I never

2    have been.  I feel absolutely terrible for anyone who's been

3    injured that day.  I know I have terrible PTSD.  I can't

4    imagine what they go through every day having to work here and

5    live here.

6              That's all I have to say, Your Honor.

7              THE COURT:  All right.  Thank you.

8              Nancy, do you need a break before I go forward?

9              THE COURT REPORTER:  (Shakes head.)

10             THE COURT:  All right.  So we'll start with some of

11   the financial issues.  So as we talked earlier about

12   restitution, there's $2,000 paid to the Clerk of the Court to

13   be forwarded to the Architect of the Capitol that was agreed to

14   by the parties for the damage done to the building, and then

15   there's an additional $30,165.65 for expenses MPD incurred

16   because of the injuries to Officer A.W. and for which the

17   defendant has not raised an objection.  So I intend to impose

18   those amounts.

19             With respect to a fine, there's -- the maximum fine is

20   250,000.  The guidelines is 20,000 to 200,000.  Probation has

21   indicated that the defendant has no ability to pay a fine, and

22   I concur.  The defendant is not gainfully employed and provided

23   no information indicating that he has such an ability to pay.

24   So I don't intend to impose a fine.

25             With respect to the sentence, the Court is to impose a

1    sentence sufficient but not greater than necessary to comply

2    with the purposes set forth in the subsection.  I'm to

3    consider the nature and circumstances of the offense, and the

4    history and characteristics of the defendant, and to impose a

5    sentence that reflects the seriousness of the offense, promotes

6    respect for the law, and provides just punishment for the

7    offense.

8         Of course, this offense is extremely serious.  A number

9    of my colleagues have spoken very eloquently about this.

10   Defendant took part in a mob riot that took place on the

11   Capitol on January 6th, 2021.  Many of the rioters, including

12   the defendant, engaged in violence and some destroyed property.

13        I have watched numerous videos of rioters who, like

14   defendant, engaged in hand-to-hand combat with police

15   officials.  It was not a peaceful event.  More than a hundred

16   law enforcement officers were injured on that day.  Moreover,

17   the Capitol sustained substantially more than the 1,500,000

18   initially estimated in property damage.

19        Many of the rioters intended to block the certification

20   of the votes for President Joe Biden.  Although the rioters

21   failed to block that certification, they delayed it for several

22   hours.

23        The security breach forced lawmakers to hide inside the

24   House gallery until they could be evacuated to undisclosed

25   locations.  In short, the rioters' actions threatened the

1  peaceful transfer of power, a direct attack on our nation's

2  democracy.

3       And the defendant fits comfortably within the group of

4  rioters that actually attacked law enforcement.  He was part of

5  some of the most violent clashes that day that took place at

6  the archway tunnel at the lower west terrace.

7       Defendant stood in the crowd of rioters carrying a large

8  gnarled stick.  He moved towards the line of officers in the

9  tunnel, and after passing the stick to another rioter, he flung

10  himself into the line of officers.  He grabbed A.W.'s face and

11  knocked him to the ground.  This made A.W. more vulnerable to

12  attack by some of the other co-defendants who kicked him and

13  dragged him down the steps away from the archway.

14       Defendant grappled with A.W. over control of his baton.

15  Defendant was able to commandeer another baton and used it to

16  strike at the other officers in the tunnel.  While all of this

17  mayhem was occurring around defendant, he moved away from the

18  archway, down the steps, and picked up A.W.'s fallen helmet as

19  a trophy of this day.  He also obtained a second helmet and a

20  badge as trophies as well, indicating the pride in which he

21  held as participation in the events that day.  In fact, he

22  displayed a trophy helmet on the wall behind the bar in his

23  home.

24       As a result of these attacks, A.W. sustained serious

25  physical injuries, including a bloody laceration to his head

1    that required two staples to close, and bruising and other

2    abrasions to his body requiring hospitalization.  A.W.'s

3    injuries required that he be off duty until May 2021 and on

4    only limited duty until approximately July 2021.

5         Defendant's assault on A.W. took place during a lull in

6    the rioters' attacks on the officers and was the instigating

7    spark that spurred further brutal attacks by rioters around

8    him, including some of his co-defendants.

9         To his credit, defendant pleaded guilty at an early

10   juncture.  As previously indicated, defendant had no criminal

11   history resulting in points, but his record does suggest some

12   level of domestic disputes in the presence of firearms.

13        Defendant is a 32-year-old man with a high school

14   equivalency.  His employment throughout his life has been

15   spotty and consisting of low-paying general labor jobs.  Other

16   than some childhood illnesses and the divorce of his parents,

17   his upbringing does not seem extraordinary by the standards of

18   the people that normally appear before me.

19        His parents divorced when he was 14 or so.  But the

20   defendant remained in contact with his father who provided more

21   than adequate child support.  There was no drug abuse or

22   physical abuse in the home, and all the defendant's material

23   needs were met.  So it's somewhat unclear how he took a wrong

24   turn.

25        Nonetheless, defendant has had a very serious drug

1    problem for much of his adulthood.  He has abused cocaine,

2    Ecstasy, and, ultimately, methamphetamines.  The drug abuse was

3    so intense that defendant developed a severe infection in his

4    genitals after injecting drugs in that area.  Perhaps because

5    of his history of drug abuse, defendant also experiences mental

6    health challenges.  He reports he suffers from PTSD and

7    depression.  He claims some of his drug usage were attempts at

8    self-medication.

9          Defendant is single but claims paternity for

10   two children.  His relationship with both of these children's

11   mothers appears to have been tumultuous, as reflected in the

12   domestic dispute arrests in the presence of drugs and firearms.

13   Defendant asserts that he has made -- he has a more stable

14   partner of late, but whether he has a sufficiently stable home

15   environment and familial support to facilitate his

16   rehabilitation upon release is yet to be seen.

17         The Court is to impose a sentence that affords adequate

18   deterrence to criminal conduct, protects the public from

19   further crimes of the defendant.  The events of January 6th

20   involved a rather unprecedented confluence of events spurred by

21   then President Trump and a number of his prominent allies who

22   bear much responsibility for what occurred on that day.

23         Since defendant's arrest he has been detained, so there

24   was no opportunity to see how he would do on release status.

25         But as I indicated earlier in my questioning, an

1    individual who has directly and brazenly attacked law

2    enforcement officers is inherently dangerous to the public

3    because one who does not hesitate to attack a law enforcement

4    officer would not hesitate to attack any member of the

5    population who angers him.  Due to defendant's history of

6    violence against law enforcement and serious drug abuse, the

7    Court is concerned that Mr. Jersey will reoffend, will be

8    emotionally swept up in irrational actions, and will be an

9    ongoing risk to the public.

10          With respect to general deterrence, the Court believes

11   that further incarceration is necessary to deter other

12   potentially violent protesters from resolving their political

13   disputes through the use of violence rather than peaceful

14   demonstrations.

15          The Court is to impose a sentence that provides

16   defendant with needed educational or vocational training,

17   medical care, or other correctional treatment in the most

18   effective manner.  As reflected in the PSR, and as conceded by

19   defense counsel, defendant's long-standing substance abuse

20   requires drug testing and treatment, both in BOP custody and

21   during supervision after release from custody.  His mental

22   health history also suggests that mental health and cognitive

23   therapy treatment is necessary and appropriately -- and

24   appropriate.

25          Finally, given the defendant's low educational

1  achievement and spotty and low-paying work history, educational

2  and vocational service programs will be ordered as well.  As

3  recommended by probation, while in BOP custody, the Court will

4  recommend the Parenting Program, Challenge Program, Drug Abuse

5  Education Program, and Nonresidential Drug Abuse Program.

6       The Court is to consider the kinds of sentences

7  available.  Given the nature of the crime, the defendant's

8  violence, and his history of serious drug abuse, the Court is

9  only considering further incarceration.  The Court is to

10  consider the kinds of sentence and the sentencing range

11  established for the applicable category of offense committed by

12  the applicable category of defendant as set forth in the

13  guidelines.

14       The Court has considered the applicable guidelines

15  and how they apply to this defendant.  No pertinent policy

16  statements issued by the Sentencing Commission have been

17  brought to my attention to apply.  The Court is to avoid

18  unwarranted sentence disparities among defendants with

19  similar records who have been found guilty of similar

20  conduct.

21       The government has provided a chart that lists a number

22  of the January 6th defendant sentencings.  As I indicated

23  earlier, I've closely analyzed the other January 6th defendants

24  who were convicted under 18 U.S.C. § 111 by researching the

25  dockets in those cases, including the applicable guidelines

1    ranges.

2         The parties have also provided useful comparator

3    information in their sentencing memoranda.  As I indicated

4    earlier, the Court makes the observation that no matter how one

5    analyzes the 111 cases, all 29 of them or just those that

6    involve 111(a) and (b) or some subset that eliminates the high

7    and low outliers or just those cases with guidelines similar to

8    defendant, the result is always the same; that the average

9    sentences cluster around the low end of the guidelines.  But

10   the Court recognizes that neither the government nor probation

11   has recommended a low-end guideline sentence.  To the contrary,

12   they both recommend high-end guideline sentences.

13        The Court is to provide restitution to any victims of

14   the offenses.  I have -- already went over that with the $2,000

15   to the Architect of the Capitol and the $30,165.65 to MPD, to

16   be paid through the clerk's office.

17        I will now indicate the sentence to be imposed, but

18   counsel will have one more opportunity to make any legal

19   objections before the sentence is actually imposed.

20        Mr. Guillaume, do you have any objections to any of the

21   factors I've considered?

22             MR. GUILLAUME:  No, Your Honor.

23             THE COURT:  Government?

24             MS. KEARNEY:  No, Your Honor.

25             THE COURT:  Okay.  Mr. Jersey, if you can come to the

1    podium.

2        It is the judgment of the Court that you, Justin Jersey,

3    are hereby committed to the custody of the Bureau of Prisons

4    for a term of 51 months.  Of course, you'll be given credit for

5    the time you have been in -- for approximately 14 months, the

6    time you've been in custody since the time of your arrest,

7    December 2nd, 2021.

8        You are further sentenced to serve a 36 -- and that's on

9    Count 9.

10        You are further sentenced to serve a 36-month term of

11    supervised release as to Count 9 and to pay a special

12    assessment of $100 as required by statute.  The Court finds

13    that you do not have the ability to pay a fine and, therefore,

14    does not impose one.

15        You are ordered to make restitution through the clerk's

16    office to the Architect of the Capitol in the amount of $2,000

17    and the Metropolitan Police Department in the amount of

18    $30,165.  These financial obligations shall be paid at a rate

19    of no less than $75 per month upon release from custody.  The

20    special assessment and restitution are payable to the Clerk of

21    the Court.  And within 30 days of any change of address, you

22    have to notify the Clerk of the Court until that financial

23    obligation is paid in full.

24        While on supervision, you shall submit to the collection

25    of DNA.  You shall not possess a firearm or other dangerous

1     weapon.  You shall not use or possess an illegal controlled

2     substance and submit to one drug test within 15 days of

3     placement on supervision and at least two periodic drug tests

4     thereafter, and you shall not commit another federal, state, or

5     local crime.

6          You shall abide by the general conditions of supervision

7     adopted by the U.S. Probation Office, which will be set forth

8     in the judgment and commitment order and which were set forth

9     in the presentence report, unto which no objections were

10    raised, as well as the following special conditions:

11         As I indicated, the substance abuse treatment, substance

12    abuse testing, mental health assessment and treatment.  And

13    these will all be laid out in the judgment and commitment

14    order.  And cognitive behavioral treatment, educational

15    services program, and vocational services program.

16         There's going to be a financial information disclosure

17    requirement while the financial obligations are outstanding.

18    So you'll have to provide information to the probation office

19    about your finances while that's outstanding.

20         Counsel, any reason other than those previously stated

21    and argued why the sentence should not be imposed as just

22    stated?

23              MR. GUILLAUME:  None, Your Honor.

24              THE COURT:  From the government?

25              MS. KEARNEY:  No, Your Honor.

1          THE COURT:  All right.  I'll impose it as stated.

2          So -- you can have a seat, Mr. Jersey.

3          So defense counsel has recommended that -- that the

4     defendant serve his time in Michigan or somewhere near

5     Michigan, and I'll recommend that placement.  And we already

6     discussed a transfer of supervision to Michigan as well.

7          Now, there's charges that need to be dismissed.

8     The defendant has pleaded to Count 9 of seven counts against

9     him in the third superseding indictment.  I gather that you

10    need to dismiss Counts 13, 14, 18, 19, 20, and 24; is that

11    correct?

12          MS. KEARNEY:  Yes, Your Honor.  Mr. Jersey was not

13    charged in the prior versions of the indictment, but to the

14    extent there are any charges against him, the government

15    dismisses them.

16          THE COURT:  Okay.  I agree with your assessment; that

17    the first two indictments did not include it.

18          All right.  Mr. Jersey, you were convicted by a plea of

19    guilty.  You can appeal your conviction if you believe that

20    your guilty plea was somehow involuntary or if there's some

21    other fundamental defect in the proceedings that was not waived

22    by your guilty plea, although I note your guilty plea had a

23    fairly substantial waiver of appellate rights.  So if you're

24    inclined to appeal, talk to your counsel about it.  There's

25    also some statutory bases for appeal that you might have that

1    were not waived by your -- your plea agreement.  So talk to

2    your attorney about those.

3         If you decide to appeal, you have the right to apply for

4    leave to appeal in forma pauperis.  That means without the

5    payment of costs.  And if you so request and qualify, the Clerk

6    of the Court will prepare and file a notice of appeal on your

7    behalf, although I note that you're represented by very able

8    counsel that can assist you in this process.

9         But, most importantly, for these purposes, with few

10   exceptions, any notice of appeal has to be filed within 14 days

11   of the entry of the judgment.  Now, it's a Friday afternoon so

12   I don't foresee the judgment being entered today.  So it's

13   probably going to be entered sometime early next week.  And

14   from that date, you have 14 days to appeal, if you choose to go

15   that route.

16        Anything else we need to cover, Mr. Guillaume?

17             MR. GUILLAUME:  No, Your Honor.

18             MS. KEARNEY:  Nothing from the government.

19             THE COURT:  All right.  Thank you.

20        So, Mr. Jersey, January 6th was a terrible, terrible day

21   in this nation's history.  You made it much worse for officers

22   like A.W.  But no one is defined by the worst thing they've

23   done in their lives.

24        So you have some time to make yourself a better person,

25   get an education, get some vocational skills.  To the extent

1       that your drug problem is still around, take care of that as

2       well, and commit yourself to your family once you get out.

3              So good luck to you, sir.

4                    THE DEFENDANT:  Thank you, Your Honor.

5                    THE COURT:  You're excused.

6                    (Proceedings were concluded at 3:35 p.m.)

7

8                    (Proceedings recorded by mechanical stenography.

9       Transcript produced by computer-aided transcription.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3              I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                       Dated this 2nd day of March, 2023.

10

11                      /s/ Nancy J. Meyer
                        Nancy J. Meyer
12                      Official Court Reporter
                        Registered Diplomate Reporter
13                      Certified Realtime Reporter
                        333 Constitution Avenue Northwest
14                      Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25